Geneva ROBERTS, Plaintiff–Appellant,

v.

WABASH LIFE INSURANCE CO., Defendant–Appellee. (2 cases)

Geneva ROBERTS, Plaintiff-Appellant,

v.

MODERN WOODMEN OF AMERICA, Defendant-Appellee.

Forrest ROBERTS et al., Plaintiffs-Appellants,

v.

OCCIDENTAL LIFE INSURANCE CO., Defendant-Appellee.

No. 1–1179A307.

Court of Appeals of Indiana, First District.

Oct. 15, 1980.

Rehearing Denied Nov. 24, 1980.

Don M. Robertson, Bunger, Harrell & Robertson, Bloomington, for plaintiffs–appellants.

Frank A. Barnhart, Baker, Barnhart & Andrews, Bloomington, for defendants–appellees.

RATLIFF, Judge.

## STATEMENT OF THE CASE

Geneva Roberts filed actions against Wabash Life Insurance Co. and Modern Woodmen of America, and her four sons filed an action against Occidental Life Insurance Co. in an effort to collect the proceeds of policies which had been issued insuring the life of their husband and father, Clarence Roberts. The Brown Circuit Court entered judgment in favor of the insurance companies after trial of the consolidated actions. We affirm.

## FACTS

Clarence Roberts and his wife, Geneva, lived approximately three miles north of Nashville, Indiana, at the intersection of Road 135 and Grandma Barnes Road. Located west of their house was a barn which they utilized as a garage and storage area. On November 18, 1970, Ella Cummings, a neighbor of Clarence Roberts, observed leaves burning at the base of a tree located near the barn on the Roberts' property. In retrospect Mrs. Cummings surmised that she could have extinguished the small fire herself if she had stopped at that time. Instead, she went to her home and called the fire department at 6:15. When the fire engine arrived at 6:30, the barn was already destroyed; witnesses recalled that the fire spread rapidly through the structure. Several vehicles were parked in the east portion of the barn. Neighbors and passers–by managed to save only one of the vehicles, Clarence Roberts' pick–up truck.

Because of the limited water supply, the firemen directed their efforts primarily toward protecting nearby buildings. Eventually they moved across the debris spraying water to cool the ashes. Their path led them to a shotgun lying across the charred remains of a body.

The Brown County coroner took the body to Indianapolis for an autopsy. Funeral services were conducted for Clarence Roberts, and the body was buried at a local cemetery. Because the investigation of the fire produced a long list of perplexing questions for which the investigators could not find plausible answers, the body was exhumed on December 21, 1970.

After the wife and sons of Clarence Roberts were unsuccessful in their attempts to collect approximately $640,000 in life insurance proceeds, they filed actions against the insurance companies. The evidence at trial reflected contrasting images of Clarence Roberts.

Clarence Roberts' attorney and physician described Roberts as a very civic–minded person who enjoyed an excellent reputation in the community. During the late 1960's, Clarence Roberts experienced financial problems due to losses suffered by several grain elevators which he owned. Lawsuits were filed against him during the summer

of 1969. Roberts reportedly became increasingly despondent.

In June 1970 Clarence Roberts hinted of suicide during a conversation with his attorney. After discussing but rejecting the possibility of filing a petition in bankruptcy, Roberts told another attorney on November 3, 1970, ". . . my widow will be the richest one in Brown County."

Some persons surmised that Clarence Roberts accidentally set the barn afire while shooting himself. Roberts kept gasoline for his lawn mower in the barn, and that fact was offered as an explanation for the rapid burning of the structure. The autopsy revealed no gunshot wound. Although the shotgun had been fired, the position of the gun over the body was not compatible with the substantial recoil which would have followed its firing.

Clarence Roberts obtained a loan from Wabash Life Insurance Co. in 1967 or 1968 for the purpose of financing construction of an apartment complex. The relationship turned into a fiasco. Wabash eventually alleged that Roberts had submitted altered bills and fictitious bills for which Wabash had paid Roberts. At the time of trial Wabash estimated that the fraudulent bills totalled a minimum of $131,000 and perhaps more than $200,000.

Alvin Haggard, who owned Al's Friendly Tavern, had known Clarence Roberts for forty years. Roberts confided in Haggard concerning his financial problems. According to Haggard, Roberts "wanted to get out of the mess he was in." Haggard never heard Roberts mention suicide. In mid–September 1970 Roberts showed Haggard a card for a Swiss bank account. Clarence Roberts told Haggard that Roberts had more than $100,000 on deposit in his own Swiss bank account.

Several people who were acquainted with Clarence Roberts saw Roberts in Morgantown on the morning of November 17, 1970. Roberts was accompanied by a man who was not known by Roberts' friends in Morgantown. The man, who was approximately the same size as Roberts but older than Roberts, was wearing a dirty brown plaid shirt. The stranger suffered some sort of seizure while in Morgantown. Clarence Roberts put the man into Roberts' car and drove toward Nashville.

Early in the afternoon of November 18, 1970, a bank officer went to the home of Clarence Roberts. He wanted to discuss with Roberts a note on which the bank suspected Roberts had forged the signature of his brother, Carson Roberts. Clarence Roberts, who was aware of the bank's suspicions, did not respond to the knock on the door.

Charles Roberts saw his cousin, Clarence Roberts, mulching leaves at Clarence Roberts' home late in the afternoon of November 18, 1970. Charles talked with Clarence briefly. Clarence, who was wearing a solid–color blue shirt, commented that his wife, Geneva, and his son, Loren, had gone to Columbus for supper. Clarence invited Charles to join him for a sandwich, but Charles declined the invitation. Charles departed. Fifteen minutes later, Charles Roberts received word of a fire at Clarence Roberts' property. Charles returned to Clarence's property approximately twenty–five minutes after Charles' departure; the roof of the barn had already collapsed due to the fire.

The Brown County coroner was concerned with establishing identity as well as cause of death for the body found amidst the debris of Clarence Roberts' barn. The body was severely burned, and the only distinctive piece of clothing to survive the fire was a portion of a brown plaid shirt. Dr. Benz, who performed the autopsy, deemed definite identification of the body impossible. Dr. Benz noted an absence of carbonous material in the respiratory tract and an absence of internal burning of the respiratory tract, but tests showed the presence of 80–86% carbon monoxide in the blood. Dr. Benz opined that the person had died from the carbon monoxide intoxication prior to the fire.

In December the bank repossessed Clarence Roberts' pick–up truck. The bank's representative soon became aware of a mas-

sive leakage of fumes into the cab of the truck. Inspection revealed thirty or more holes in the exhaust system. The holes looked as if they had been made with a hammer and punch.

On the morning after the fire, the coroner located Clarence Roberts' Masonic ring beneath several inches of ashes. The ring showed little fire damage. An expert witness testified that the solder in the ring should have melted at a much lower temperature than the temperature required to disintegrate the fingers, hands, and arms. The witness, John Kennedy, studied photographs which had been taken during and after the fire and also examined some of the bones from the body. Kennedy believed that the area where the body was found had been saturated with flammable liquid which caused an accelerated rate of burning. Kennedy expressed the opinion that the body had been soaked with a flammable liquid and burned after the limbs had been removed.

A blood sample taken from the body was reported as type AB. Clarence Roberts' military records indicated that his blood type was B. The Roberts challenged the reliability of the blood–typing efforts and also suggested that military records frequently are inaccurate.

X–rays from Clarence Roberts' medical records were compared with x–rays taken of the body. The expert witnesses had differing opinions concerning the validity of the comparison as well as the similarities and dissimilarities detectable by the comparison.

A tooth discovered near the body was identified as a lower right second molar. Clarence Roberts' lower right second molar had been removed several years prior to the fire. The Roberts' witnesses insisted that the tooth could be a first molar rather than a second molar. Other witnesses pondered the question of why other teeth had not been found.

Donald Barrett testified that Clarence Roberts had been in Barrett's tavern in Mentone, Indiana, at least twenty times prior to November 18, 1970. He was usually with a woman who was not Geneva Roberts. Barrett testified that Roberts and that woman were in his tavern in April 1972. Other acquaintances of Clarence Roberts testified that they saw Roberts in 1974 and in 1975.

Radiologists, anthropologists, pathologists, dentists, law enforcement officers, investigators, relatives, and friends offered differing opinions as to whether the body found on November 18, 1970, was that of Clarence Roberts. The trial court ultimately entered judgment in favor of the insurance companies in the actions filed by the wife and sons of Clarence Roberts.

## ISSUES

1. Did the Roberts prove by a preponderance of the evidence that the body which was found amidst the debris on Clarence Roberts' property on November 18, 1970, is the body of Clarence Roberts?

2. Does the evidence lead solely to a conclusion that the Roberts are entitled to the relief which they seek?

3. Did the trial court erroneously disregard certain statutory and common law presumptions of death?

4. Did the trial court provide adequate findings of fact?

5. Did the trial court err in finding that the Roberts had a duty to submit proof of death to the life insurance companies but failed to meet that duty?

6. Did the failure of the insurance companies to produce a certain private investigator as a witness at trial necessitate the trial court's recognition of an inference unfavorable to the insurance companies?

7. Did the trial court erroneously permit a witness to testify as an expert witness regarding matters outside of his area of expertise?

8. Did the trial court err in excluding evidence concerning polygraph examinations?

## DISCUSSION AND DECISION

*Issues One and Two*

■ The Roberts' lawsuits are based upon two theories. First, the Roberts con-

tend that the burned body is that of Clarence Roberts. The Roberts had the burden of proving that contention. In order for the Roberts to be entitled to relief from the negative judgment, the evidence must lead solely to a conclusion opposite that reached by the trial court. *Frybarger v. Coffelt*, (1979) Ind.App., 387 N.E.2d 104.

The Roberts assert that the evidence leads solely to a conclusion that they should have been granted the relief which they seek. They have painstakingly set forth the evidence most favorable to their position, and they have attempted to show lack of credibility in that evidence which is unfavorable to them.

An appellate court will not weigh the evidence or assess the credibility of witnesses. *Grad v. Cross*, (1979) Ind.App., 395 N.E.2d 870. The two adjectives which best describe the evidence in this case are "voluminous" and "conflicting." The evidence does not lead solely to a conclusion opposite that reached by the trial court.

*Issue Three*

As their second theory the Roberts argue that, regardless of whether the body was proven to be that of Clarence Roberts, the wife and sons are entitled to a presumption of death under the statutory and common law because more than seven years had passed between the date of Clarence Roberts' disappearance and the date of the trial. The insurance companies respond that, even if the wife and sons are entitled to a presumption of death due to the passing of time, the Roberts failed to prove that death occurred prior to the lapse of the life insurance contracts.[1]

When a person is inexplicably absent from home for a continuous period of seven years, fails to communicate with those persons who would be most likely to hear from him, and cannot be found despite diligent inquiry and search, that person is presumed to be dead. *Equitable Life Assurance Society v. James*, (1920) 73 Ind.App.

186, 127 N.E. 11; *Metropolitan Life Insurance Co. v. Lyons*, (1912) 50 Ind.App. 534, 98 N.E. 824. The Roberts introduced evidence from which the trier of fact could conclude that Clarence Roberts had been absent from home without explanation for a continuous period exceeding seven years, that he had not communicated with his family and friends during that period, and that diligent search for him had proven futile. The Roberts insist that the burden of proof shifted to the insurance companies after the Roberts introduced evidence giving them the benefit of the presumption of death.

In *Fuller v. Supreme Council of Royal Arcanum*, (1917) 64 Ind.App. 49, 60, 115 N.E. 372, Judge Hottel explained that

> "[c]ertain evidence may give rise to a presumption in favor of the party having the burden of proof, which will impose upon the adverse party the necessity or duty of going forward with the evidence, but the burden of proof is not thereby shifted. The burden of the issue continues where the law places it though some presumptions in favor of the party who bears it may require the adverse party to go forward with the proof. *Keys v. McDowell*, (1913) 54 Ind.App. 263, 100 N.E. 385, and cases there cited."

We quote also from *Equitable Life Assurance Society v. James, supra*, at page 188 of 73 Ind.App., at page 12 of 127 N.E.:

> "The presumption of death which arises after a continuous absence for a period of seven years, of one who left his home for a temporary purpose, and from whom no tidings have been received, is not a conclusive presumption, but may be rebutted by proof of facts and circumstances inconsistent with, and sufficient to overcome, such presumption. [Citation omitted] When, in an action of this kind, there is any evidence tending to rebut the presumption of death, arising from such absence, it is for the jury to say whether such evidence is sufficient to rebut the presumption...."

---

1. All of the life insurance contracts had expired by August 12, 1972, due to non-payment of premiums.

Although the burden of proof did not shift to the insurance companies, the insurance companies did have an obligation to go forward with evidence to rebut the presumption of death.

Clarence Roberts was having severe financial difficulties at the time of his disappearance. His dealings with Wabash Life Insurance Co. were, at best, questionable and perhaps fraudulent. Clarence Roberts allegedly had forged a signature in order to obtain a loan, and he knew that he was about to be called to answer for doing so. Roberts expressed dissatisfaction concerning his relationship with his wife and children, and he was seen on numerous occasions in the company of a woman who was not his wife. Roberts confided in a friend that he "wanted to get out of the mess he was in" and that he had a Swiss bank account with a balance exceeding $100,000. This evidence could reasonably lead a trier of fact to a conclusion that Clarence Roberts had the motives and the financial ability to absent himself from his home indefinitely without communicating with his family and friends.

Additionally, the life of Clarence Roberts was insured for approximately $640,000. Roberts disappeared on the same day that a body was found in the debris left after his barn was destroyed by fire. Investigation of the fire revealed evidence of possible murder and arson.[2] The disappearance of Clarence Roberts could reasonably be viewed as a part of a scheme to defraud the life insurance companies.

The trial court, as trier of fact, wrote in finding number eleven: "The evidence introduced at the trial of the cause further indicates that the disappearance of the insured, Clarence Roberts, on November 18, 1970, is explainable by a reasonable hypothesis other than his death on that date." The Roberts insist that the trial court erroneously ignored the presumption of death and imposed upon them the duty to prove Clarence Roberts' death beyond a reasonable doubt. The Roberts also ask this court to explore what role a presumption retains

after controverting evidence has been introduced.

In *Kaiser v. Happel*, (1941) 219 Ind. 28, 30, 36 N.E.2d 784, the trial court had read the following instruction:

" 'I instruct you that under the law, every person is presumed to be of sound mind until the contrary is proved and in this case the law presumes that Amelia Seip was a person of sound mind at the time of the execution of the will in controversy, and the defendants are entitled to the benefit of this presumption until and unless such presumption is overcome by a preponderance of all the evidence. . . .' "

The Supreme Court declared the instruction erroneous and reversed the judgment. In doing so, the Supreme Court stated that the ultimate facts can be established by direct or circumstantial evidence as well as by the reasonable inferences to be drawn therefrom, but a presumption is not evidence. In the case at bar, the lengthy disappearance of Clarence Roberts, his failure to communicate with friends and family, and the fruitless search for Roberts amounted to circumstantial evidence of death, but the presumption of death was not evidence of the ultimate fact.

In *Sumpter v. State*, (1974) 261 Ind. 471, 306 N.E.2d 95, Justice Hunter explained that a rebuttable presumption does not shift the burden of proof but it does impose upon the opposing party a burden of producing evidence. Justice Hunter also stated that, if the opponent of the presumption produces evidence which rebuts the presumption, the presumption serves no further purpose in the case. In the case at bar, the Roberts had the burden of proof throughout the trial. Once they introduced evidence of the basic facts which gave rise to the presumption of death, the insurance companies had the burden of going forward with evidence rebutting the presumption of death. If the insurance companies had not done so, the Roberts would have prevailed. The insurance companies did introduce com-

---

2. Clarence Roberts was indicted for murder and kidnapping in 1975.

petent evidence to rebut the presumption of death. The Roberts were then obligated to prove, by direct and circumstantial evidence and the reasonable inferences to be drawn therefrom, the ultimate fact of Clarence Roberts' death. The trial court found that the Roberts did not prove by a preponderance of the evidence that the body found after the fire was that of Clarence Roberts and the Roberts did not prove by a preponderance of the evidence that Clarence Roberts died at any time prior to the expiration of the insurance policies. The trial court correctly held the Roberts only to a standard of proving death by a preponderance of the evidence and not beyond a reasonable doubt.

The Roberts contend that the trier of fact ignored evidence of Clarence Roberts' exposure to peril on the date of his disappearance. The trier of fact could reasonably have concluded that Clarence Roberts died in the fire because he was seen near the barn only minutes before the barn burned and he was absent from his home continuously after the fire, but the trier of fact was not obligated to reach that conclusion.

■ The Roberts also argue that they should prevail in this proceeding by application of IC 1971, 29–2–5–1; 29–2–6–1; and 29–2–7–1 (Burns Code Ed.). These sections provide for the administration of an absentee's estate and prescribe the date of presumed death for an absentee whose estate is being so administered.

In particular, IC 29–2–7–1 provided as follows prior to a change which was effected in 1976:

"PRESUMPTION OF DEATH OF ABSENTEE.—The presumption of death, recited in the first section [29–2–5–1], of the said act above entitled as amended, in the case of any person who, since the passage of said act and the amendment above recited, has absented himself from his usual place of residence and gone to parts unknown, or who has not been heard of for the period of five [5] years,

shall relate back to the time of the first disappearance of such absentee; and it shall be presumed and taken by all courts that such absentee was dead on the first day of his disappearance: Provided, however, That this section shall not apply to any suit now pending; neither shall a party holding or entitled to the proceeds of any policy of insurance upon the life of such absentee, where the five [5] years have expired prior to the passage and taking effect of this act, and whose duty it is to make proof of the death of such absentee be required, when such proof is not prohibited by the contract with the insurer, to make other proof of death than the fact of the disappearance of the insured for five [5] years continuously."

The Roberts insist that this provision is applicable to their factual situation and establishes the date of Clarence Roberts' death, for the purposes of collecting the insurance money, as November 18, 1970.[3]

The Appellate Court, in *Connecticut Mutual Life Insurance Co. v. King*, (1911) 47 Ind.App. 587, 93 N.E. 1046, held that the statute which now appears as IC 29–2–7–1 relates only to the settlement of estates of absentees and has no application independently in determining rights under insurance contracts. In *Prudential Insurance Co. v. Moore*, (1925) 197 Ind. 50, 149 N.E. 718, the Supreme Court specifically approved the Appellate Court's holding in *Connecticut Mutual*. In 1976 our legislature, presumably aware of the construction which had been given the provision, omitted entirely the portion which refers to insurance proceeds.

Although the Roberts have made diligent effort to explore the legislative background of these provisions, we are constrained to hold that IC 29–2–7–1 does not apply to the facts in the case at bar.

*Issue Four*

■ The Roberts charge that the trial court's findings of fact are not specific

---

**3.** The Roberts did not follow the statutorily prescribed procedure for gaining the benefit of IC 29–2–7–1.

enough to satisfy Ind. Rules of Procedure, Trial Rule 52.

Judge Garrard made these observations in the case of *In re Marriage of Miles*, (1977) Ind.App., 362 N.E.2d 171, 174:

"the purpose of special findings is to provide the parties and reviewing courts with the theory on which the judge decided the case in order that the right of review for error may be effectively preserved.... Thus, *whether the findings are adequate depends upon whether they are sufficient to disclose a valid basis under the issues for the legal result reached in the judgment.* In making this determination a reviewing court will accept the findings made by the trial court if they are supported by evidence of probative value.... Furthermore, on appeal the findings will be construed together and will be liberally construed in support of the judgment." (Our emphasis; footnotes omitted; citations omitted.)

According to the statement of the issues which appears on page 431 of Volume 2 of the record, the Roberts presented two issues, exclusive of the question of damages, for resolution at trial:

"Theory 1: The preponderance of the evidence leads to the conclusion that the identity of the fire victim was and is Clarence Roberts.

"Theory 2: The result of the seven year absence leads to the rebuttable presumption that Clarence Roberts is dead and that the policies of life insurance upon his life on November 18, 1970 as a result of said lapse of time are payable to the beneficiaries of said policies."

The trial court provided findings of fact concerning the insurance coverage and then continued with findings which clearly disclose a valid basis under the issues for the legal result reached in the judgment: (1) The Roberts did not prove by a preponderance of the evidence that the body is that of Clarence Roberts. (2) The insurance companies introduced competent evidence supplying an explanation for Clarence Roberts' absence. (3) The Roberts did not introduce

evidence of any peril which might have caused Clarence Roberts' death after November 18, 1970, but prior to expiration of the insurance contracts. (4) The Roberts at no time provided sufficient proof of death to require payment of the insurance proceeds. Furthermore, we find support in the record for each of the findings: (1) The evidence is in conflict as to the identity of the body. (2) The domestic, financial, and legal problems of Clarence Roberts provide explanation for his absence. (3) The Roberts introduced no evidence of any peril threatening Clarence Roberts after November 18, 1970. (4) Proof of death had to be provided in order to satisfy the terms of the insurance contracts; Clarence Roberts' death prior to expiration of the insurance contracts was not proven prior to or during the trial. The findings of fact satisfy T.R. 52.

*Issue Five*

■ The Roberts insist that the trial court's finding number five demonstrates that the judgment is contrary to law:

"That each of the life insurance policies contained a provision requiring that the beneficiary or claimant under the policy file due proof of death before benefits of the policies were payable. Prior to the trial of this cause, the plaintiffs had not satisfied the policy requirements of filing due proof of death."

The Roberts offer the following reasoning:

"The law in Indiana is without conflict that the effect of denial of liability by insurer or the refusal to pay by an insurer obviates the necessity of further compliance by the insured as to the giving of notice of furnishing of proofs and operates as a waiver of any defects or tardiness in such proofs as may have been furnished."

The Roberts have confused two very different factual situations. They rely upon cases in which the insurance companies denied all liability under the policies because, for example, the applicant allegedly made false statements in the application for the insurance coverage. In the case at bar, the evidence shows that the insurance compa-

nies acknowledged the existence of the coverage on November 18, 1970, but they refused payment because they deemed the tendered proof of death to be insufficient evidence of the insured's death.[4] The finding does not demonstrate that the judgment is contrary to law.

*Issue Six*

■ The Roberts argue that error occurred because "the Court failed to grant to the plaintiffs an inference which the plaintiffs were entitled to as a result of the defendants' failure to produce William Mitchell, an employee of the defendants, who resided beyond the jurisdictional limits of the courts of Indiana."

During his deposition Mitchell stated that he had been employed by the law firm of Rocap, Rocap, Reese and Young on behalf of The Life Insurance Company of North America; that insurance company is not a party in any of the actions which have been consolidated herein. The Roberts have not demonstrated error.

*Issue Seven*

■ The Roberts contend that the trial court erroneously permitted John Kennedy to testify as an expert witness in an area outside of which Kennedy's training, background, and experience qualified him as an expert. In particular, the Roberts assert that Kennedy was erroneously permitted to state his opinions concerning medical matters when Kennedy possessed no expertise in the area of medicine.

Our Supreme Court wrote in *Isenhour v. State*, (1901) 157 Ind. 517, 528, 62 N.E. 40, 44:

"Courts have never undertaken to set up a standard of scientific knowledge by which the competency of a witness may be determined, and have not gone to the extent of holding that a scientific witness can only testify from facts learned by him from personal demonstration. The general rule, in such cases, in this state at least, seems to be that, where a witness exhibits such a degree of knowledge, gained from experiments, observation, standard books, or other reliable source, as to make it appear that his opinion is of some value, he is entitled to testify, leaving to the trial court, in the exercise of a sound discretion, the right to say when such knowledge is shown, and to the jury the right to say what the opinion is worth; and, as in all other cases of discretion, this court will review the action of the trial court only when that discretion clearly appears to have been abused."

Kennedy had been a fire and explosion investigator for more than thirty years; during that time he had conducted between 2,500 and 3,000 fire investigations in addition to writing three textbooks, writing various manuals, and conducting seminars. Kennedy stated that his fire investigation experience included numerous fires in which burned bodies were found. He indicated that he had done substantial research on the subject of burned bodies for a book which he had written.

We find no abuse of discretion in permitting Kennedy to testify as an expert witness or in permitting him to answer the questions to which the Roberts objected. Kennedy's skill, knowledge, and experience qualified him to answer the questions. It was for the trier of fact to decide the weight to be given the testimony, based upon Kennedy's credentials.

*Issue Eight*

■ The Roberts assert that the trial court erred in excluding the testimony of Kenneth Houck concerning polygraph examinations which he administered to various members of Clarence Roberts' family. The Roberts contend that Houck's testimony would have disclosed the areas of questioning during the polygraph examinations and the appearance of the persons during the examinations. Houck was permitted to

---

4. Mrs. Roberts submitted the John Doe death certificate and a letter from an anthropologist in which the anthropologist stated in summary that "there has been nothing discovered in a morphological comparison that would be incompatible with the identification of the cadaver as that of Clarence Roberts."

testify concerning the areas of questioning; the results of the polygraph examinations were stipulated into evidence. No error occurred in sustaining the insurance companies' objection.

Having carefully considered each of the issues presented for review, we hold that the Roberts have failed to demonstrate reversible error.

Judgment affirmed.

ROBERTSON, P. J., and NEAL, J., concur.