In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 08-1734 and 08-2377

JOHN R. MALONE, JR., as Trustee of
the Gordon L. Beeler Irrevocable Trust,

*Plaintiff-Appellant,*

*v.*

RELIASTAR LIFE INSURANCE CO. and
AXA EQUITABLE LIFE INSURANCE CO.,

*Defendants-Appellees.*

Appeals from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 05 C 660—**William C. Lee**, *Judge.*[1]

ARGUED OCTOBER 27, 2008—DECIDED MARCH 12, 2009

Before KANNE, WILLIAMS, and SYKES, *Circuit Judges*.

KANNE, *Circuit Judge*. This is a case about death. To be
entitled to the death benefit payable under a life insur-

---

[1] Judge Allen Sharp, who presided during the jury trial in this
case, was later replaced in post-trial proceedings by Judge
William C. Lee.

ance policy, a beneficiary must prove that the insured is *actually*, or, in the alternative, perhaps only *legally*, dead. There is a difference between the two. As is often the case in the law, words and concepts so familiar in everyday life assume esoteric identities when cloaked in legal rhetoric. It should come as no surprise, then, that not even death, perhaps the most sobering and forthright fact in life, is immune from legal definition.

A life insurance beneficiary may prove an insured's death in two ways. One avenue is for the beneficiary to utilize direct or circumstantial evidence to prove, by a preponderance of the evidence, that an insured is, in fact, dead. In lieu of proving actual death, however, a beneficiary may seek to prove death by means of a legal presumption. In other words, although the insured may, as a matter of fact, be alive, in certain circumstances the law permits one to presume he is dead. The mechanics of this presumption are at the center of this case. For the reasons that follow, we conclude that the district court incorrectly instructed the jury and employed a flawed special verdict form. Taken together, these errors were prejudicial. We remand for a new trial.

## I. Background

Gordon Beeler, a husband, father, and businessman, disappeared on January 31, 1998. At the time of his disappearance, Beeler left behind a wife of almost thirty years, Kathy; four living children, ranging in ages from twelve to twenty-two; and a business partner, John Martin. None of these individuals has seen or heard from Beeler since that

day in 1998. Beeler was fifty-one years old at the time he disappeared.

Beeler had obtained no fewer than six different life insurance policies, three of which are at issue in this case. AXA Equitable Life Insurance Company[2] issued the first policy to Gordon Beeler on September 20, 1991. The policy carries a death benefit of $500,000. ReliaStar Life Insurance Company[3] issued the other two disputed policies. Beeler obtained the first, which carries a death benefit of $600,000, on December 9, 1991. He took out the second shortly thereafter, on January 29, 1992. The death benefit of the second policy is $1.5 million. Added together, these three policies are to pay a total of $2.6 million to the named beneficiary upon the death of Gordon Beeler. In November 1999, Kathy Beeler transferred ownership of these policies to the Gordon L. Beeler Irrevocable Trust, dated May 26, 1999 ("Beeler Trust").

Each of the three policies originally named Kathy Beeler as the sole beneficiary. At the same time that she transferred policy ownership, however, Kathy Beeler also amended the policies to name the Beeler Trust as beneficiary. John Malone, Beeler's former business partner,

---

[2] At the time it issued Policy 41-233-834, one policy at issue, AXA Equitable Life Insurance Company was operating under the name of Equitable Variable Life Insurance Company.

[3] At the time it issued Policies 7-011-915 and 7-014-919, two policies at issue, ReliaStar Life Insurance Company was operating under the name of Northwestern National Life Insurance Company.

serves as trustee for the Beeler Trust; it is in the role of trustee that Malone brought this action. Kathy Beeler and the Beeler children are the Beeler Trust's beneficiaries.

The Beeler Trust first sought payment of death benefits under the AXA policy in a claim filed in November 2003,[4] which AXA denied the following February. In January 2004, the Beeler Trust filed similar claims for payment on the two ReliaStar policies; ReliaStar denied these claims in correspondence dated March 30, 2004. Both companies noted that seven years had not yet passed, which was the time required for the common law presumption of death to take effect in Indiana.

In February 2005, the Beeler Trust submitted renewed death claims to both AXA and ReliaStar. In separate correspondence mailed in April, both companies declined to pay the benefits under their respective policies. The

---

[4] As we referenced in the opening stanza of this opinion, death can have many meanings under the law. For probate purposes, Indiana law presumes a person to be dead after only a five-year absence. *See* Ind. Code § 29-2-5-1. Accordingly, in July 2003, Kathy Beeler filed an affidavit with the St. Joseph Probate Court requesting that the court admit Beeler's will to probate. The court granted this request and declared Gordon Beeler deceased in an order issued August 11, 2003. The State of Indiana issued a death certificate that same day. Counter-intuitive as it may be, these probate proceedings have no effect on the matter presented to us, which concerns Indiana's common law presumption of death, not the state's probate law. *See Prudential Ins. Co. of Am. v. Moore*, 149 N.E. 718, 722 (Ind. 1925).

insurance companies cited evidence they had obtained suggesting that Beeler was either still alive or had not died at the time of his disappearance.

Eight months later, in October, the Beeler Trust filed a complaint in Indiana's St. Joseph Superior Court, alleging that AXA and ReliaStar had breached their respective contracts and seeking payment of the death benefits payable thereunder. The defendants promptly removed the case to the South Bend Division of the Northern District of Indiana. In June 2006, the Beeler Trust filed an amended complaint in the federal court, in which it added a claim for punitive damages, alleging that the companies had made unfounded refusals to pay death benefits and had deceived the Beeler Trust, thereby violating the insurance companies' duties of good faith and fair dealing. In an order dated March 21, 2007, the district court granted summary judgment in favor of the insurance companies on the plaintiff's punitive damages claims, leaving only the breach of contract claims for trial.

At a jury trial held from May 21 to May 29, 2007, the Beeler Trust presented evidence to demonstrate Beeler's death. The plaintiff showed that Beeler had been missing since the day of his disappearance nine years earlier in 1998. The family, the authorities, and the life insurance companies had conducted numerous fruitless investigations in an effort to locate Beeler. Beeler's last known communication was a letter to Kathy dated January 31, 1998, and postmarked in Key West, Florida. In the letter, Beeler informed his wife of many arrangements he had made to provide financial security for both Kathy and

their children long into the future. Finally, none of Beeler's family or friends had any communication with Beeler since his disappearance.

The insurance companies argued that Beeler could not be presumed dead; they claimed that he had left simply to extricate himself from an increasingly troublesome family situation. They presented evidence that Beeler's last years with his family were far from idyllic. He engaged in an extramarital affair. He grew distant from his family and was often absent from family gatherings. His marriage with Kathy became strained. He spent long periods of time living away from the family's primary home in Granger, Indiana, often staying in hotels or escaping by himself to their vacation house in Marco Island, Florida. Near the conclusion of 1997, Beeler leased an apartment in nearby South Bend, Indiana. In early 1998, Kathy Beeler filed an action in state court seeking a formal separation from her husband and a temporary restraining order to keep him away from the family's home. Following a hearing on January 28, the court granted both requests. Kathy spoke with her husband on the telephone three days later, on the morning of January 31. She never spoke with him again.

The insurance companies also presented witnesses who testified that they had seen Beeler since 1998. Several witnesses testified that they had encountered Beeler in the months following his disappearance. A friend of the Beeler family stated that she had seen Beeler in the Indianapolis airport as late as May 2004.

As the trial neared conclusion, the plaintiff entered objections to both Jury Instruction 22 and the court's

proposed special verdict form. We will discuss the contents of both the jury instruction and the verdict form in the analysis that follows. These two objections, both denied by the district court, form the primary basis for the claims raised by the appellant, the Beeler Trust, on appeal. Following deliberations, the jury returned a verdict in favor of the defendants. Pursuant to the questions posed in the special verdict form, the jury found, specifically, that the plaintiff had not established the elements necessary to raise the presumption of death.

On February 26, 2008, the district court denied the Beeler Trust's Renewed Motion for Judgment as a Matter of Law, or, In the Alternative, For New Trial. The court subsequently denied the Beeler Trust's motion to reconsider its February 26 order, as well as its request to certify to the Indiana Supreme Court the question of whether Jury Instruction 22 and the special verdict form accurately stated Indiana's common law presumption of death.[5]

## II. ANALYSIS

The Beeler Trust appeals the district court's summary judgment order on the punitive damages claims, the court's formulation of Jury Instruction 22 and the special verdict form, and the court's denial of its motion for a

---

[5] Our decision on the merits of the Beeler Trust's request for a new trial makes it unnecessary to certify questions to the Indiana Supreme Court. We therefore affirm the district court's order denying the Beeler Trust's motion for certification.

new trial. We turn first to its death benefits claims, which encompass appellant's arguments regarding Instruction 22 and the special verdict form, as well as the motion for a new trial. We then briefly discuss the punitive damages claims.

*A.  The Death Benefits Claims*

On appeal, the Beeler Trust argues that errors in both the jury instructions and the special verdict form prejudiced the trial's outcome. We agree. As we discuss below, these errors, standing alone, would not merit a new trial. Taken together, however, they prevented the jury from considering one of the two ways in which the plaintiff could prove Gordon Beeler's death. For that reason, a new trial is required.

In the state of Indiana, a claimant seeking to prove an insured's death may pursue two separate avenues of proof. Under the first, a claimant may use direct or circumstantial evidence to prove by a preponderance of the evidence that the insured is, in fact, dead. Under the second, a claimant may seek to prove death by means of a common law presumption. Indiana law dictates that a person is presumed dead if the following conditions are met: first, that the individual has been "inexplicably absent" for a continuous period of seven years; second, that the individual has not communicated with those persons who would be most likely to hear from him; and third, that the missing individual cannot be found "despite diligent inquiry and search." *Roberts v. Wabash Life Ins. Co.*,

410 N.E.2d 1377, 1382 (Ind. Ct. App. 1980). Once raised, however, the presumption of death may be rebutted " 'by proof of facts and circumstances inconsistent with, and sufficient to overcome, such presumption.' " *Id.* (quoting *Equitable Life Assur. Soc. of the U.S. v. James*, 127 N.E. 11, 12 (Ind. App. 1920)). It is for the jury to conclude whether the presumption has been sufficiently rebutted. *Equitable Life,* 127 N.E. at 12.

The nature of the errors alleged in this case makes critical the order of operations relative to the presumption. We must determine whether facts tending to disprove death prevent the presumption from ever arising in the first instance, or whether they serve only to rebut the presumption once it has arisen. In the vast majority of cases, such a minute distinction would make no difference. The ultimate inquiry, after all, is simply whether, after the evidence is in, the presumption of death survives. And if the presumption does not survive, rarely does one care about the cause of its demise—either because it never arose or because it arose but was then rebutted. We turn first to the source of the confusion: the use by Indiana courts of the term "inexplicably absent" as a prerequisite to raise, in the first instance, the common law presumption of death.

1.  *Interpreting "Inexplicably Absent" and Jury Instruction 22*

As stated above, under black-letter Indiana law, a party seeking to raise the presumption of an individual's death must show that the individual has been "inexplica-

bly absent" for a period of seven years. *Roberts*, 410 N.E.2d at 1382. The meaning of "inexplicably absent," however, is far from black-letter, and its proper inter-pretation, which the district court attempted to define in Jury Instruction 22, is at the center of this dispute.

The distinction, as we alluded to earlier, is one of timing. If a party contesting an individual's death has evidence that tends to show that the individual is still living, does that evidence prevent the presumption from ever arising because the individual's absence is not "inexplica-ble"? Or, alternatively, does the presumption arise from the individual's mere absence and lack of tidings, with such explanatory evidence saved for purposes of rebuttal? The district court, in Jury Instruction 22, embraced the former procedure, which we now find to have been in error.

The purpose of Jury Instruction 22 was to explain to the jury the ways in which the plaintiff could prove Gordon Beeler's death. It went into great detail about the presumption process, including the prerequisites for raising the presumption in the first instance. It stated, correctly, that the person must be "inexplicably absent" for a continuous period of seven years. The district court then attempted to define "inexplicably absent." At the request of defense counsel, and over the objection of the plaintiff, the court added the following definition: "As used in these instructions, the phrase 'inexplicably absent' means that his absence is unexplained by circumstances other than those suggesting death."

We review *de novo* whether jury instructions contain fair and accurate summaries of the law. *Calhoun v. Ramsey*,

408 F.3d 375, 379 (7th Cir. 2005). Reversal is only appropriate, however, if the instructions failed to adequately state the law and the error likely misled or confused the jury, thereby prejudicing the appellant. *Gile v. United Airlines, Inc.*, 213 F.3d 365, 374-75 (7th Cir. 2000); *see also Schobert v. Ill. Dep't of Transp.*, 304 F.3d 725, 730 (7th Cir. 2002). An erroneous jury instruction is not prejudicial unless, "considering the instructions as a whole, along with all of the evidence and arguments, the jury was misinformed about the applicable law." *Susan Wakeen Doll Co. v. Ashton-Drake Galleries*, 272 F.3d 441, 452 (7th Cir. 2001).

Keeping these tenets in mind, we turn now to the first question at hand: whether, under Indiana law, "inexplicably absent" means an absence "unexplained by circumstances other than those suggesting death." We conclude that it does not.

Early Indiana cases provided no support for the use of "inexplicably absent." In *Baugh v. Boles*, 66 Ind. 376 (Ind. 1879), an Indiana Supreme Court decision that dealt peripherally with this issue, the court said:

> It has long been an accepted rule of law . . . that where a person has left his usual place of abode, and no intelligence concerning him has been received by his relatives, or by those who would probably hear from him, if living, after the lapse of seven years . . . such person would be presumed to be dead.

*Id.* at 384. The court made no mention of an inexplicable absence.

The phrase is also conspicuously absent from several subsequent decisions by Indiana's intermediate appellate court. In *Metropolitan Life Insurance Co. v. Lyons*, 98 N.E. 824 (Ind. App. 1912), the court stated that the presumption of death arose from an "unexplained absence" of seven years. *Id.* at 825. But there is a marked difference between an absence that is "inexplicable," i.e., *incapable* of explanation, and one that is merely "unexplained." The defendants quote repeatedly from *Lyons* the passage that reads: "If the person alleged to be dead has been absent from his home for seven years, a presumption of death may arise; but *proof of absence alone will not give rise to this presumption*." *Id.* (emphasis added). Yet, in so doing, the defendants fail to note the sentence that follows:

> If, in addition to the absence of such person for the required time, it is shown that he left for a temporary purpose of business or pleasure, and that he had not returned, and that those most likely to hear from him have received no word or tidings from him, the presumption of death arises, after an absence of seven years.

*Id.* at 825-26. In other words, the court simply enunciated the remaining prerequisites for the presumption to arise, *see Roberts*, 410 N.E.2d at 1382, which remain uncontested by either party. It is clear that the "something more" required by *Lyons* was not an inexplicable absence.

The Indiana appellate court addressed this question directly in *Equitable Life Assurance Society of the United States v. James*, 127 N.E. 11 (Ind. App. 1920). In that case,

in which a man was suspected of forgery and was supposedly seen by two witnesses following the date of his disappearance, the insurance company argued that "there [was] no state of facts from which such a presumption could have arisen; that such a presumption arises only from an unexplained absence; and that where the absence is explained, or the person has been seen during the period of his absence, the presumption does not arise." *Id.* at 12. The court disagreed. It held that the common law presumption arises "after a continuous absence for a period of seven years, of one who left his home for a temporary purpose, and from whom no tidings have been received." *Id.* Explanation for the absence, said the court, was rebuttal evidence. *Id.* The court found that the plaintiff's evidence was sufficient to raise the presumption, and that the explanatory evidence of the individual's absence was available only for rebuttal. *Id.*

Perhaps most persuasive are the facts from *Roberts v. Wabash Life Insurance Co.*, 410 N.E.2d 1377 (Ind. Ct. App. 1980), the case in which an Indiana court first used the "inexplicably absent" language. *Id.* at 1382. In *Roberts*, firefighters discovered a dead body while extinguishing a fire in a barn owned by Clarence Roberts. *Id.* at 1379. The charred remains were initially thought to be those of Roberts himself. *See id.* Further investigation, however, suggested that the body was not Roberts. *See id.* at 1380-81. In fact, the evidence indicated that Roberts might have killed a man and then burned the body in the barn in an effort to fake his own death, with the intent of avoiding creditors and potential charges of fraud. *Id.* at

1383. His wife, claiming Roberts to be dead or presumed dead, contested the insurance company's refusal to pay on Roberts's life insurance policies. *Id.* at 1381-82.

Using language notably similar to that found in Jury Instruction 22, the trial court in *Roberts* concluded that the presumption of death had never arisen because Roberts's disappearance was "explainable by a reasonable hypothesis other than his death." *Id.* at 1383. The Indiana Court of Appeals disagreed. After stating that a prerequisite to raising the presumption of death was an "inexplicabl[e]" absence of seven years, *id.* at 1382, the court found that requirement satisfied, stating that the plaintiffs had "introduced evidence of the basic facts which gave rise to the presumption of death," *id.* at 1383. It reached this conclusion despite evidence of murder, arson, fraud, and financial ruin, all of which clearly made Roberts's disappearance anything but "inexplicable," at least in the literal sense of the word. But the court looked to that evidence only to rebut the presumption once it was raised, not to prevent it from ever arising. Thus, the Indiana appellate court's application of the "inexplicably absent" standard has differed from the phrase's common meaning since the first day of the standard's existence.

Indeed, adopting the definition of "inexplicably absent" found in Jury Instruction 22 would effectively eliminate the presumption of death. The purpose of the presumption is to provide relief to those who might not be able to prove a person's death with direct or circumstantial evidence. *See Green v. Shalala*, 51 F.3d 96, 100 (7th Cir. 1995).

If, to raise the presumption, a party were required to prove that an individual's absence was, as the district court stated, "unexplained by circumstances other than those suggesting death," then the presumption would no longer be necessary: armed with such evidence, the party would likely be able to prove the individual's death-in-fact. The result would be that no party actually needing the presumption would be able to raise it. *See Green*, 51 F.3d at 100 (noting that such a high standard "places an untenable burden on the claimant to disprove every possible explanation for the missing person's absence"). Although the Indiana Supreme Court has not addressed this issue, the Wisconsin Supreme Court has recognized this problem when discussing its own state's presumption of death:

> [T]he rule is satisfied by a lack of intelligence or tidings for seven years, even if a reason for the absence is shown. Were it otherwise the presumption would never attach where any reason for leaving is given, and, in such case, no recovery could ever be had except upon proof of actual death.

*Ewing v. Metro. Life Ins. Co.*, 210 N.W. 819, 820 (Wis. 1926).

We conclude, based on our analysis of Indiana law, that the *Roberts* requirement of an inexplicable absence for the common law presumption of death to arise is, at worst, the result of inartful drafting or, at best, a term of art with a far different interpretation than its common meaning. Because the *Roberts* court cited the *Equitable Life* decision as support for its test, *see* 410 N.E.2d at 1382, we look to both of those decisions to reach what we feel

is the appropriate interpretation of Indiana law on this point. Under this interpretation, the common law presumption of death arises if the party seeking to prove a person's death presents evidence demonstrating (1) that person's continued absence for a period of seven years; (2) that person's failure to communicate with those individuals who would be most likely to hear from him; and (3) the inability to find that person, despite diligent inquiry and search. *Cf. Roberts*, 410 N.E. at 1382; *Equitable Life*, 127 N.E. at 12. Evidence offered to explain an individual's absence goes toward the rebuttal of the presumption, not to prevent the presumption from first arising. *Equitable Life*, 127 N.E. at 12.[6]

Given such an interpretation, the definition contained in Jury Instruction 22 was an incorrect statement of law. To raise the presumption, a party need not show that an individual's absence "is unexplained by circumstances other than those suggesting death." As we mentioned previously, however, such an error, by itself, does not merit a new trial. A party must show prejudice as well. *Schobert*, 304 F.3d at 730.

In almost every situation, the timing issue that we have just calibrated would make no difference in the outcome of a trial. What matters, obviously, is whether the presumption of death exists at the end of the in-

---

[6] Such an interpretation of the *Roberts* test brings Indiana in line with the approach adopted by the Seventh Circuit in an analogous situation. *See Green*, 51 F.3d at 100-01 (interpreting the presumption of death in the context of Title II of the Social Security Act).

quiry. Whether it was terminated because it never first arose, or whether it arose but was eliminated by rebuttal evidence should make no difference. Turning to this case, it would generally be irrelevant *why* the jury concluded that the presumption of death was inapplicable and did not entitle the Beeler Trust to relief. What made it important here, however, and what ultimately prejudiced the plaintiff, was the interplay of the error in Jury Instruction 22 with a second error in the jury's special verdict form. We turn our discussion now to this second error.

2.  *The Two Avenues of Proving Beeler's Death and the Special Verdict Form*

Federal Rule of Civil Procedure 49 permits a court to submit to the jury either a general or special verdict form. A special verdict form requires the jury to return specific findings on issues of disputed fact raised by the parties during trial. Fed. R. Civ. P. 49(a). In the special verdict form, the court must present to the jury "all material issues raised by the pleadings and evidence." *U.S. Fire Ins. Co. v. Pressed Steel Tank Co.*, 852 F.2d 313, 318 (7th Cir. 1988). We review a district court's formulation of questions on a special verdict form for an abuse of discretion. *Id.* at 316.

The special verdict form at issue here was significantly flawed. It posed a series of three questions. A short paragraph after each question instructed the jury how to proceed based upon its answer to the preceding question.

The first question listed the elements necessary to
raise the presumption of death and asked the jury to
determine whether the Beeler Trust had proven these
elements by a preponderance of the evidence. If the
jury answered no, meaning that the claimant had failed
to raise the presumption of death, the form instructed
the jury not to consider the remaining two questions.
According to the special verdict form, such a response
ended the jury's inquiry: the defendants had prevailed.

If the jury found that the Beeler Trust had successfully
raised the presumption of death under Question 1, the
form instructed the jury to proceed to Question 2. The
second question asked whether the defendants had
presented evidence sufficient to rebut the presumption.
If the jury found insufficient evidence to rebut the pre-
sumption, the special verdict form again instructed the
jury that its inquiry was over. The result, however, was
now different: an unrebutted presumption of death
meant that the plaintiff had won.

Recall now the two evidentiary avenues available to
prove death. In addition to proving death by means of a
legal presumption, claimants may also prove death the
more traditional way: by direct or circumstantial evidence
of the ultimate fact of the insured's death. According to
the verdict form's instructions, if the jury determined,
under Question 2, that the defendants had rebutted the
presumption—meaning that the plaintiff had failed to
prove death using the presumption avenue—the jury
was to proceed to the final question. There, the court
asked the jury to decide whether the plaintiff, using

direct or circumstantial evidence, had proven by a preponderance of the evidence that Gordon Beeler was in fact dead.

We find the problem with the special verdict form in the instructions that follow Question 1. The jury answered Question 1 in the negative, meaning that it concluded that the Beeler Trust had failed to meet the elements necessary to raise the presumption of death. The jury then did as the form instructed and ended its deliberations. It never considered Question 3, which asked the jury to consider whether the plaintiff had proven death by the alternative path, through direct and circumstantial evidence of death-in-fact. Because the jury should have considered whether the plaintiff had satisfied this alternative means of proof, the erroneous instruction following Question 1 was a legal error that constituted an abuse of the district court's discretion.

The district court's confusion on this point is understandable. In *Roberts*, the court found that the plaintiff had introduced the basic facts necessary to give rise to the presumption of death, which the defendant had subsequently rebutted. 410 N.E. at 1383-84. Once the presumption was rebutted, the court said that the plaintiffs "were then obligated to prove, by direct and circumstantial evidence and the reasonable inferences to be drawn therefrom, the ultimate fact of Clarence Roberts' death." *Id.* at 1384. In the facts of *Roberts*, therefore, the presumption was rebutted, which triggered consideration of the alternative avenue of proof. But it would be illogical to require those same facts in every case.

It would make no sense to conclude that the alternative avenue of direct and circumstantial evidence can be considered *only* when the presumption dies by rebuttal. There is no reason to distinguish those cases where the plaintiff fails to assert facts sufficient to give rise to the presumption in the first instance from those where the presumption arises but is later rebutted. What matters, as we mentioned above, is the question of the presumption's ultimate survival. If the presumption does not survive, the reason for its demise should make no difference to whether a jury must consider the alternative question of direct and circumstantial proof of death. Here, however, because of the special verdict form's construction, the trial's outcome potentially hinged on that improper distinction.

Defendants advance arguments of waiver. They claim that the Beeler Trust rested its entire case on the presumption of death, that it never presented any evidence to prove Beeler's actual death, and that the lawyers never made any arguments to the jury under this alternative means of proof. *See* Fed. R. Civ. P. 49(a)(3). We need not decide here whether waiver of one avenue of proof in these situations is possible; for even if waiver were possible, the plaintiff did not do so here. Furthermore, the court clearly intended to allow the jury to consider both means of proof; having made that decision, the court was then obligated to present to the jury an accurate statement of the law in its instructions and verdict form.

Indiana courts have recognized that the same facts that one must prove to raise the presumption of death also

serve as circumstantial evidence of death-in-fact. *See Roberts*, 410 N.E.2d at 1383 ("[T]he lengthy disappearance of Clarence Roberts, his failure to communicate with friends and family, and the fruitless search for Roberts amounted to circumstantial evidence of death . . . ."). The intermediate appellate court gave a more thorough review of this idea in *Lyons*:

> "Any facts or circumstances relating to the character, habits, conditions, affections, attachments, prosperity, and objects in life, which usually control the conduct of men, and are the motives of their actions, are competent evidence from which may be inferred the death of one absent and unheard from, whatever has been the duration of such absence. A rule excluding such evidence would ignore the motives which prompt human actions, and forbid inquiry into them in order to explain the conduct of men."

98 N.E. at 826 (quoting *Tisdale v. Conn. Mut. Life Ins. Co.*, 26 Iowa 170, 176 (Iowa 1868)). Clearly, then, the plaintiff in this case, by virtue of the evidence it advanced to demonstrate the presumption of death, also presented circumstantial evidence that would allow the jury to infer that Gordon Beeler was actually dead. Thus, we reject the defendants' arguments that the plaintiff presented no circumstantial evidence of death-in-fact and was therefore barred from presenting that question to the jury.

A review of the trial transcripts also demonstrates the plaintiff's cognizance of this alternative means of proof, as well as the court's willingness to permit the jury to consider the death-in-fact question. In the instructions

conference, plaintiff's counsel requested a change to Jury Instruction 22, noting that "if we don't convince the jury that the presumption applies, we can still prevail in the case if the jury concludes that even without the presumption the facts support their concluding that he is dead as a matter of fact." The court recognized this and adjusted the instructions accordingly.

### 3. *Prejudicial Effect of the Combined Errors*

Taken in isolation, neither error was prejudicial. Given a properly constructed special verdict form, a jury would presumably have reached the death-in-fact question, notwithstanding the erroneous definition of "inexplicably absent" contained in Jury Instruction 22. As we have discussed, Instruction 22 made the timing of the presumption procedure important; but if both Question 1 and Question 2 directed the jury to consider Question 3, this issue would have become irrelevant. The jury would have considered whether the plaintiff had proven actual death by circumstantial evidence regardless of whether the presumption never arose or whether it arose but was later rebutted, thereby making the incorrect definition of "inexplicably absent" harmless.

Similarly, if Jury Instruction 22 had not contained the erroneous definition of "inexplicably absent," it is likely that the error in the special verdict form would not have been prejudicial. By moving the timing question to the forefront of its deliberations, the erroneous definition served to logjam the jury's decision. It raised an impermissibly high hurdle to raise the presumption of

death in the first instance. Without that instruction, it is certainly possible that the jury would have proceeded to Question 2, which, unlike Question 1, left open the possibility of advancing to Question 3.

Considered together, however, these errors were anything but harmless. The inaccurate statement of law contained in Jury Instruction 22, combined with the procedure set forth in the special verdict form, made the mechanics of the presumption procedure paramount and, as a result, prevented the jury from ever considering the plaintiff's alternative means of proving Beeler's death. A new trial is required.

### B. The Punitive Damages Claim

The Beeler Trust also appeals the district court's grant of summary judgment in favor of the defendants on the Beeler Trust's punitive damages claims. We review *de novo* the district court's decision to grant summary judgment. *Alexander v. Wis. Dep't of Health & Family Servs.*, 263 F.3d 673, 680 (7th Cir. 2001). Summary judgment is appropriate when, drawing all reasonable inferences in favor of the appellant, there remains no genuine issue as to any material fact, thereby making judgment as a matter of law appropriate. *See* Fed. R. Civ. P. 56; *Alexander*, 263 F.3d at 680.

The Indiana Supreme Court has recognized that an insurance company's tortious breach of its duties of good faith and fair dealing can serve as the basis for an insured's punitive damages claim. *See Erie Ins. Co. v. Hickman ex rel.*

*Smith*, 622 N.E.2d 515, 519 (Ind. 1993). The court also noted, however, that such a claim "does not arise every time an insurance claim is erroneously denied." *Id.* at 520. A "good faith dispute" regarding the existence of a valid claim will not permit recovery of punitive damages, even if the insurance company is ultimately determined to have erroneously denied payment of benefits. *Id.*

As the appellant correctly notes, however, an insurance provider's duty of good faith extends beyond decisions to pay or deny benefits. *See Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 976 (Ind. 2005). Indiana courts have declined to determine the full extent of this duty, but they have noted that a provider may not make an unfounded refusal to pay benefits nor cause an unfounded delay in making payment. *See Erie Ins. Co.*, 622 N.E.2d at 519. Evidence of bad faith in refusing to pay benefits or causing unfounded delays must demonstrate "a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will." *Magwerks Corp.*, 829 N.E.2d at 977 (internal quotation marks omitted).

After reviewing the record, we conclude that this is nothing more than a good faith dispute over coverage. The plaintiff has not demonstrated evidence of bad faith on the part of the insurance providers sufficient to survive summary judgment on a claim for punitive damages.

### III. CONCLUSION

For the aforementioned reasons, we AFFIRM the district court's grant of summary judgment in favor of the defen-

dants on the Beeler Trust's claim for punitive damages. However, due to the errors in Jury Instruction 22 and the jury's special verdict form, we VACATE the judgment entered by the district court at the conclusion of the jury trial and REMAND for a new trial. Our decision makes certification of questions to the Indiana Supreme Court unnecessary; thus, we AFFIRM the district court's order denying the Beeler Trust's motion for certification.